Andrew R. Muehlbauer, Esq.
Nevada Bar No. 10161
**MUEHLBAUER LAW OFFICE, LTD.**
7915 West Sahara Ave., Suite 104
Las Vegas, NV 89117
Telephone: (702) 330-4505
Email: andrew@mlolegal.com

*Attorneys for Plaintiff*

[Additional counsel on signature block]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| MORLY GOURDET, derivatively on behalf of RICHTECH ROBOTICS INC.,<br><br>Plaintiff,<br><br>vs.<br><br>ZHENWU (WAYNE) HUANG, ZHENQIANG (MICHAEL) HUANG, SAUL FACTOR, STEPHEN MARKSCHEID, and JOHN SHIGLEY,<br><br>Defendants,<br><br>and<br><br>RICHTECH ROBOTICS INC.,<br><br>Nominal Defendant. | Case No.: 2:26-cv-1048 |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Morly Gourdet ("Plaintiff"), by Plaintiff's undersigned attorneys,

derivatively and on behalf of Nominal Defendant Richtech Robotics Inc. ("Richtech" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Zhenwu (Wayne) Huang ("W. Huang"), Zhenqiang (Michael) Huang ("M. Huang"), Saul Factor ("Factor"), Stephen Markscheid ("Markscheid"), and John Shigley ("Shigley") (collectively, the "Individual Defendants" and together with Richtech, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Richtech, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and against Defendants W. Huang and M. Huang for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Richtech, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Richtech's directors and officers from January 27, 2026 to January 29, 2026, both dates inclusive (the "Relevant Period").

2. Richtech is a Nevada corporation headquartered in Las Vegas, Nevada, chiefly engaged in the robotics and artificial intelligence ("AI") industries. More specifically, the Company develops and implements various embodied AI systems for use in U.S. businesses.

3. The Company's AI systems service a number of other industries, including the following: industrial manufacturing, automotive, healthcare, hospitality, food service, and retail. As such, the Company's AI systems are purported to be able to perform a number of commercial and industrial tasks. One notable Company product is known as "ADAM," which is an AI service robot intended for the automation of making various types of drinks.

4. In January 2026, Richtech announced that it had initiated a collaboration with Microsoft Ai Co-Innovation Labs ("Microsoft") pertaining to the development of the Company's robots, notably the ADAM product.

5. At all relevant times, the Individual Defendants represented or implied that the Company possessed a business collaboration relationship with Microsoft involving joint engineering efforts.

6. For instance, on January 27, 2026, the first day of the Relevant Period, the Company issued a press release titled "Richtech Robotics Collaborates with Microsoft to Advance Agentic AI in Real-World Robotics Applications" (the "Collaboration Press Release"). The Collaboration Press Release reported that "[Richtech] ***today announced a hands-on collaboration with Microsoft through the Microsoft AI Co-Innovation Labs to jointly develop and deploy agentic artificial intelligence capabilities*** in real-world robotic systems."[1]

7. On January 27, 2026, the Company entered into a private placement with an institutional investor (the "January 2026 Private Placement"). Under the terms of the January 2026 Private Placement, 8,500,000 shares of Company Class B Common Stock were purchased at a purchase price of $4.55 per share, resulting in aggregate gross proceeds of approximately $38.7 million. The January 2026 Private Placement closed on January 29, 2026, with net proceeds totaling approximately $36.2 million.

8. The truth fully emerged on January 29, 2026, at 12:00 PM EST, when the

---

[1] Unless otherwise stated, all emphasis is added.

online publication Hunterbrook Media published an article titled "Breaking: Microsoft Denies Partnership with Richtech Robotics" (the "Hunterbrook Article") (formatting altered from original). The Hunterbrook Article revealed that, contrary to the Individual Defendants' representations, "***Microsoft tells [Hunterbrook] the engagement was a "standard" customer program*** with "***no commercial element***."

9. On this news, the price per share of the Company's Class B common stock fell $1.06, or approximately 20.87%, from a closing price of $5.08 per share on January 28, 2026 to close at $4.02 per share on January 29, 2026. As the market continued to react to the revelations about the Company's relationship with Microsoft, the Company's Class B common stock fell a further $0.44 per share, or approximately 10.9%, from a closing price of $4.02 per on January 29, 2026 to close at $3.58 per share on January 30, 2026.

10. During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Richtech, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company did not maintain a commercial collaboration with Microsoft; (2) the Company did not engage in a joint engineering effort with Microsoft; (3) the Company utilized the false claim of its collaborative relationship with Microsoft to raise the price of its stock in anticipation of the January 2026 Private Placement; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

11. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

12. In light of the Individual Defendants' misconduct, which has subjected Richtech, its Founder/Chief Executive Officer ("CEO"), and its Co-Founder/Chief

Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the District of Nevada (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

13. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

14. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and Defendants W. Huang's and M. Huang's liability in the Securities Class Action, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

**JURISDICTION AND VENUE**

15. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claim also raises a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18. Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

19. Plaintiff is a current shareholder of Richtech. Plaintiff has continuously held Richtech common stock since first purchasing shares on January 27, 2026.

### Nominal Defendant Richtech

20. Richtech is a Nevada corporation with its principal executive offices at 2975 Lincoln Rd, Las Vegas, Nevada 89115. Richtech's Class B common stock shares trade on The NASDAQ Stock Market, LLC ("NASDAQ") under the ticker symbol "RR."

### Defendant W. Huang

21. Defendant W. Huang is the Company's founder and has served as its CEO and as a Company director since its founding in July 2016. According to the Schedule 14A the Company filed with the SEC on September 16, 2025 (the "2025 Proxy Statement"), as of August 25, 2025, Defendant W. Huang beneficially owned 30,308,000 shares of the Company's Class A common stock. As such, Defendant W. Huang possessed 54.34% of the Company's total voting power as of August 25, 2025, making Defendant W. Huang a controlling shareholder.

22. The 2025 Proxy Statement stated the following about Defendant W. Huang:

> ***Mr. Zhenwu (Wayne) Huang*** has served as our Founder, Chief Executive Officer and director since the founding of the Company in July 2016. Mr. Huang has 20 years of experience leading corporations across multiple technology industries. Mr. Huang directs the core focus of the company, formulates and implements business policies through the Company's management team, and directly oversees R&D operations. He served as co-founder and Chief Executive Officer of Nanjing Rich Digital Technology Co. Ltd. from 2003 to 2007, a leading value-add service provider for

> telecommunications. There, he pioneered live interactive TV games based on smart computer vision. and had a peak audience of over 100 million subscribers. This success can be attributed to Mr. Huang's understanding of customer centric design, utilizing technology to elevate the customer experience. Mr. Huang served was the co-founder and Chief Executive Officer of Richtech System Ltd. from 2007 to 2016, a global supplier of smart hardware and interactive multimedia systems to over 120 countries. Mr. Huang received a Bachelor in Computer Information Management from Huadong Finance and Economics College in July 2000. We believe that Mr. Huang's extensive knowledge of our Company as co-founder and his experience in executive roles across multiple industries make him qualified to serve on our Board.

(Emphasis in original).

**Defendant M. Huang**

23. Defendant M. Huang is the Company's co-founder and has served as the Company's CFO and as a Company director since its founding in July 2016. According to the 2025 Proxy Statement, as of August 25, 2025, Defendant M. Huang beneficially owned 7,892,000 shares of the Company's Class A common stock. As such, Defendant M. Huang possessed 14.15% of the Company's total voting power as of August 25, 2025.

24. The 2025 Proxy Statement stated the following about Defendant M. Huang:

> ***Mr. Zhenqiang (Michael) Huang*** has served as our co-founder, Chief Financial Officer and director since the founding of the Company in July 2016. He oversees the functions relating to finance, accounting, reporting and procurement. Mr. Huang was co-founder of Nanjing Rich Digital Technology Co. Ltd. from 2003 to 2007 where he oversaw international cooperation and partnerships. He served as co-founder and Chief Financial Officer of Richtech System Ltd. from 2007 to 2016, leading the company on its international expansion and business development. Mr. Huang holds a management training certificate from the Federal Ministry of Economics and Technology of Germany since 2012. He received his Bachelor's Degree in Economics from Nanjing University in June 2000. We believe that Mr. Huang's extensive knowledge of our Company as co-founder and his experience in finance and international business development make him qualified to serve on our Board.

(Emphasis in original).

**Defendant Shigley**

25. Defendant Shigley has served as a Company director since November 2023. Defendant Shigley currently serves as the Chair of the Audit Committee.

26. The 2025 Proxy Statement stated the following about Defendant Shigley:

> ***Mr. John Shigley*** joined our Board as an independent director in November 2023. Mr. Shigley is a retired Nevada certified public accountant with over 30 years of executive experience in large casino-hotels. Mr. Shigley has held various positions in finance, marketing and operations, including Chief Financial Officer of Primadonna Resorts (1998 to 2000), President of Caesars Palace (2000 to 2001), Executive Vice President of New York, New York Hotel and Casino in Las Vegas (2002 to 2005), Executive Vice President (2005 to 2011) and Chief Financial Officer (2005 to 2008) of MGM Grand Hotel Las Vegas, President of MGM Vietnam (March 2011 to April 2013), Executive Vice President of MGM Macau (May 2013 to January 2014) and Chief Operating Officer of Gaming for MGM China (January 2014 to February, 2019). Mr. Shigley received his B.S. in Accountancy from Northern Illinois University and spent his early career with a large international certified public accounting firm. We believe that Mr. Shigley's experience in financial and operational management and his established network in the hospitality industry make him a qualified candidate to serve on our Board.

(Emphasis in original).

**Defendant Markscheid**

27. Defendant Markscheid has served as a Company director since November 2023. Defendant Markscheid currently serves as the Chair of the Compensation Committee, as a member of the Audit Committee, and as a member of the Nominating and Corporate Governance Committee.

28. The 2025 Proxy Statement stated the following about Defendant Markscheid, in relevant part:

> ***Mr. Stephen Markscheid*** joined our Board as an independent director in November 2023. Mr. Markscheid has been the Managing Partner of Aerion Capital, a family office, since July 2022. He currently serves as independent non-executive director of six other publicly listed companies: Jinko Solar Inc. (NYSE: JKS), a solar panel manufacturer (since 2010); ConnectM

> Technology Solutions, Inc. (Nasdaq: CNTM), a technology company (since July 2024); Four Leaf Acquisition Corporation (Nasdaq: FORL), a special purpose acquisition company (since 2023); Charlton Aria Acquisition Corporation (Nasdaq: CHARU), a special purpose acquisition company (since October 2024); Pantages Acquisition Corporation (Nasdaq: PGACU), a special purpose acquisition company (since December 2024), and Starry Sea Acquisition Corporation (Nasdaq: SSEAU), a special purpose acquisition company (since June 2025). Mr. Markscheid previously served as a director on numerous public boards including Cenntro Inc. (Nasdaq CENN), an electric vehicle manufacturer from 2023 to 2024, UGE International (XTSX:UGE), a solar installation company from August 2019 to July 2023, Fanhua, Inc. (Nasdaq: FANH), a financial services provider from 2007 to 2024, Kingwisoft Technology Services Ltd. (HKSE: 8295.HK), an information technology company from 2016 to 2024, and several special purpose acquisition companies. He is also a trustee emeritus of Princeton-in-Asia. From 1998 to 2006, he worked for GE Capital. During his time with GE Capital, Mr. Markscheid led GE Capital's business development activities in China and Asia Pacific, primarily acquisitions and direct investments. Prior to GE Capital, Mr. Markscheid worked with the Boston Consulting Group throughout Asia. He was a banker for ten years in London, Chicago, New York, Hong Kong and Beijing with Chase Manhattan Bank and First National Bank of Chicago. Mr. Markscheid began his career with the US-China Business Council, in Washington D.C. and Beijing. He earned a BA in East Asian Studies from Princeton University in 1976, an MA in international affairs from Johns Hopkins University in 1980, and an MBA from Columbia University in 1991, where he was class valedictorian. We believe that Mr. Markscheid's extensive experience serving on public boards and working with technology companies makes him a qualified candidate to serve on our Board.

(Emphasis in original).

**<u>Defendant Factor</u>**

29. Defendant Factor has served as a Company director since November 2023. Defendant Factor currently serves as the Chair of the Nominating and Corporate Governance Committee, as a member of the Audit Committee, and as a member of the Compensation Committee.

30. The 2025 Proxy Statement stated the following about Defendant Factor:

> ***Mr. Saul Factor*** joined our Board as an independent director in November 2023. Mr. Factor has over 20 years of experience as a healthcare and pharmaceuticals executive, with experience driving business operations across various countries around the world. Mr. Factor currently serves as president of Factor Healthcare Consulting, a pharmaceuticals consulting company, which he founded in 2020. Prior to that, he served in various roles at different pharmaceuticals and healthcare companies, including serving as president of Smith Drug Company (2017 to 2020), where he directed marketing, sales, operations, and financial functions; executive vice president of strategy at Accord Healthcare (2016 to 2017); president of global sourcing & procurement and senior vice president of Global Generics at McKesson Corporation (2006 to 2016); chief operating officer at RX America, LLC (2003 to 2006); and B2B Brand Manager and Leader at Eli Lily & Company (2000 to 2003). Mr. Factor received a Bachelor of Science in Pharmacy from Northeastern University and a Master of Business Administration (MBA) from the University of New Haven. We believe that Mr. Factor's executive leadership experience and specialty in fostering corporate growth make him a qualified candidate to serve on our Board.

(Emphasis in original).

**<u>FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS</u>**

31. By reason of their positions as officers, directors, and/or fiduciaries of Richtech and because of their ability to control the business and corporate affairs of Richtech, the Individual Defendants owed Richtech and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Richtech in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Richtech and its shareholders so as to benefit all shareholders equally.

32. Each director and officer of the Company owes to Richtech and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

33. The Individual Defendants, because of their positions of control and authority

as directors and/or officers of Richtech, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

34. To discharge their duties, the officers and directors of Richtech were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

35. Each Individual Defendant, by virtue of his, her, or its position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Richtech, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Richtech's Board at all relevant times.

36. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon

truthful and accurate information.

37. To discharge their duties, the officers and directors of Richtech were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Richtech were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Nevada and the United States, and pursuant to Richtech's own Code of Ethics (the "Code of Ethics");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Richtech conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Richtech and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Richtech's operations would comply with all applicable laws and Richtech's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

38. Each of the Individual Defendants further owed to Richtech and the shareholders the duty of loyalty requiring that each favor Richtech's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

39. At all times relevant hereto, the Individual Defendants were the agents of each other and of Richtech and were at all times acting within the course and scope of such agency.

40. Because of their advisory, executive, managerial, and directorial positions with Richtech, each of the Individual Defendants had access to adverse, non-public information about the Company.

41. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Richtech.

## **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

42. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching

their respective duties.

43. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

44. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Richtech was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

45. Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

46. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Richtech and was at all times acting within the course and scope of such agency.

## **RICHTECH'S CODE OF ETHICS**

47. The Company's Code of Ethics states that it "is applicable to all directors,

officers, and employees of the Company[.]" The Code of Ethics further notes that its intent is to:

- promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- promote the full, fair, accurate, timely, and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "SEC"), as well as in other public communications made by or on behalf of the Company;

- promote compliance with applicable governmental laws, rules, and regulations;

- deter wrongdoing; and

- require prompt internal reporting of breaches of, and accountability for adherence to, this Code.

48. The Code of Ethics, under the heading "Honest Ethical and Fair Conduct," states the following:

> Each person owes a duty to the Company to act with integrity. Integrity requires, among other things, being honest, fair, and candid. Deceit, dishonesty, and subordination of the Company's interests to personal interests are inconsistent with integrity. Service to the Company should never be subordinated to personal gain or advantage.
>
> Each person must:
>
> - Act with integrity, including being honest and candid while still maintaining the confidentiality of the Company's information where required or in the Company's interests.
>
> - Observe all applicable governmental laws, rules, and regulations.
>
> - Comply with the requirements of applicable accounting and auditing standards, as well as Company policies, in order to maintain a high standard of accuracy and completeness in the Company's financial records

and other business-related information and data.

- Adhere to a high standard of business ethics and not seek competitive advantage through unlawful or unethical business practices.

- Deal fairly with the Company's customers, suppliers, competitors, and employees.

- Refrain from taking advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair-dealing practice

- Protect the assets of the Company and ensure their proper use.

- Refrain from taking for themselves personally opportunities that are discovered through the use of corporate assets and refrain from using corporate assets, information, or position for general personal gain outside the scope of employment with the Company.

- Avoid conflicts of interest, wherever possible, except under guidelines or resolutions approved by the Board of Directors (or the appropriate committee of the Board). Anything that would be a conflict for a person subject to this Code also will be a conflict if it is related to a member of his or her family or a close relative. Examples of conflict of interest situations include, but are not limited to, the following:

    - any significant ownership interest in any supplier or customer;

    - any consulting or employment relationship with any customer, supplier, or competitor;

    - any outside business activity that detracts from an individual's ability to devote appropriate time and attention to his or her responsibilities with the Company;

    - the receipt of any money, non-nominal gifts, or excessive entertainment from any company with which the Company has current or prospective business dealings;

    - being in the position of supervising, reviewing, or having any

influence on the job evaluation, pay, or benefit of any close relative;

- selling anything to the Company or buying anything from the Company, except on the same terms and

- conditions as comparable officers or directors are permitted to so purchase or sell; and

- any other circumstance, event, relationship, or situation in which the personal interest of a person subject to this Code interferes – or even appears to interfere – with the interests of the Company as a whole.

49. Under the heading "Disclosure," the Code of Ethics states the following:

The Company strives to ensure that the contents of and the disclosures in public communications and in the reports and documents that the Company files with the SEC shall be full, fair, accurate, timely, and understandable in accordance with applicable disclosure standards, including standards of materiality, where appropriate. Each person must:

- not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent auditors, governmental regulators, self-regulating organizations, and other governmental officials, as appropriate; and

- in relation to his or her area of responsibility, properly review and critically analyze proposed disclosure for accuracy and completeness.

In addition to the foregoing, the Chief Executive Officer and Chief Financial Officer of the Company and each subsidiary of the Company (or persons performing similar functions), and each other person that typically is involved in the financial reporting of the Company must familiarize himself or herself with the disclosure requirements applicable to the Company as well as the business and financial operations of the Company.

Each person must promptly bring to the attention of the Chairman of the Audit Committee of the Company's Board of Directors (or the Chairman of the Company's Board of Directors if no Audit Committee exists) any information he or she may have concerning (a) significant deficiencies in the design or operation of internal and/or disclosure controls which could adversely affect the Company's ability to record, process, summarize, and report financial data

> or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures, or internal controls.

50. Under the heading "Compliance," the Code of Ethics states the following:

> It is the Company's obligation and policy to comply with all applicable governmental laws, rules, and regulations. It is the personal responsibility of each person to, and each person must, adhere to the standards and restrictions imposed by those laws, rules, and regulations, including those relating to accounting and auditing matters.

51. Under the heading "Reporting and Accountability," the Code of Ethics states, in relevant part:

> The Board of Directors or Audit Committee, if one exists, of the Company is responsible for applying this Code to specific situations in which questions are presented to it and has the authority to interpret this Code in any particular situation. Any person who becomes aware of any existing or potential breach of this Code is required to notify the Chairman of the Board of Directors or Audit Committee promptly. Failure to do so is itself a breach of this Code.
>
> Specifically, each person must:
>
> - Notify the Chairman promptly of any existing or potential violation of this Code.
>
> - Not retaliate against any other person for reports of potential violations that are made in good faith.
>
> The Company will follow the following procedures in investigating and enforcing this Code and in reporting on the Code:
>
> - The Board of Directors or Audit Committee, if one exists, will take all appropriate action to investigate any breaches reported to it.
>
> - If the Audit Committee (if one exists) determines by majority decision that breach has occurred, it will inform the Board of Directors.
>
> - Upon being notified that a breach has occurred, the Board by majority decision will take or authorize such disciplinary or preventive action as it

> deems appropriate, after consultation with the Audit Committee (if one exists) and/or the Company's counsel, up to and including dismissal or, in the event of criminal or other serious violations of law, notification of the SEC or other appropriate law enforcement authorities.
>
> No person following the above procedure shall, as a result of following such procedure, be subject by the Company or any officer or employee thereof to discharge, demotion, suspension, threat, harassment, or, in any manner, discrimination against such person in terms and conditions of employment.

52. Under the heading "Waivers and Amendments," the Code of Ethics states, in relevant part:

> Any associate of the Company having any information or knowledge regarding the existence of any violation or suspected violation of the Code has a duty to report the violation or suspected violation to any member of the Committee or the Board of Directors. Additionally, any associate may report, on a confidential and anonymous basis, any concerns regarding questionable accounting or auditing matters in accordance with the procedures set forth in Section III.C above.

53. In the section "Questions Under the Code and Waiver Procedures," the Code of Ethics states:

> Any waiver (defined below) or an implicit waiver (defined below) from a provision of this Code for the principal executive officer, principal financial officer, principal accounting officer or controller, and persons performing similar functions or any amendment (as defined below) to this Code is required to be disclosed in the Company's Annual Report on Form 10-K or in a Current Report on Form 8-K filed with the SEC.
>
> A "waiver" means the approval by the Company's Board of Directors of a material departure from a provision of the Code. An "implicit waiver" means the Company's failure to take action within a reasonable period of time regarding a material departure from a provision of the Code that has been made known to an executive officer of the Company. An "amendment" means any amendment to this Code other than minor technical, administrative, or other non-substantive amendments hereto.
>
> All persons should note that it is not the Company's intention to grant or to permit waivers from the requirements of this Code. The Company expects full

compliance with this Code.

54. In violation of the Code of Ethics, the Individual Defendants, as key officers and as members of the Company's Board, conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Ethics, the Individual Defendants failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## RICHTECH'S AUDIT COMMITTEE CHARTER

55. The Audit Committee Charter of Richtech Robotics Inc. (the "Audit Committee Charter") outlines the purpose, composition, and responsibilities of the Company's Audit Committee.

56. Per the Audit Committee Charter, the Audit Committee's purpose is defined as follows:

> The Audit Committee is appointed by the Board of the Company to assist the Board in monitoring (1) the integrity of the annual, quarterly and other financial statements of the Company, (2) the independent auditor's qualifications and independence, (3) the performance of the Company's independent auditor and (4) the compliance by the Company with legal and regulatory requirements. The Audit Committee also shall review and approve all related - party transactions.
>
> The Audit Committee shall prepare the Audit Committee report required by the rules of the Securities and Exchange Commission (the "Commission") to be included in the Company's annual proxy statement.

57. Under the heading "Committee Authority and Responsibilities," the Audit Committee Charter states the following, in relevant part:

> The Audit Committee shall discuss with the independent auditor its responsibilities under generally accepted auditing standards, review and

> approve the planned scope and timing of the independent auditor's annual audit plan(s) and discuss significant findings from the audit, including any problems or difficulties encountered.
>
> The Audit Committee shall make regular reports to the Board. These reports shall include a review of any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the independence and performance of the Company's independent auditor, the performance of the internal audit function and any other matters that the Audit Committee deems appropriate or is requested by the Board. The Audit Committee shall review and reassess the adequacy of this Charter annually and recommend any proposed changes to the Board for approval. The Audit Committee annually shall review the Audit Committee's own performance.

58. Under the same section, in the subsection "Financial Statement and Disclosure Matters," the Audit Committee Charter states that the Audit Committee will:

> 1. Meet with the independent auditor prior to the audit to review the scope, planning and staffing of the audit.
>
> 2. Review and discuss with management and the independent auditor the annual audited financial statements, and recommend to the Board whether the audited financial statements should be included in the Company's Annual Reports on Form 10-K (or the annual report to stockholders if distributed prior to the filing of the Form 10-K).
>
> 3. Review and discuss with management and the independent auditor the Company's quarterly financial statements prior to the filing of its Quarterly Reports on Form 10-Q, including the results of the independent auditor's review of the quarterly financial statements.
>
> 4. Discuss with management and the independent auditor, as appropriate, significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including:
>
> a. any significant changes in the Company's selection or application of accounting principles;
>
> b. the Company's critical accounting policies and practices;

c. all alternative treatments of financial information within U.S. generally accepted accounting principles ("GAAP") that have been discussed with management and the ramifications of the use of such alternative accounting principles;

d. any major issues as to the adequacy of the Company's internal controls and any special steps adopted in light of material control deficiencies; and

e. any material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences.

5. Discuss with management the Company's earnings press releases generally, including the use of "pro forma" or "adjusted" non-GAAP information, and any financial information and earnings guidance provided to analysts and rating agencies. Such discussion may be general and include the types of information to be disclosed and the types of presentations to be made.

6. Discuss with management and the independent auditor the effect on the Company's financial statements of (i) regulatory and accounting initiatives and (ii) off-balance sheet structures.

7. Discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including the Company's risk assessment and risk management policies.

8. Discuss with the independent auditor the matters required to be discussed by Statement on Auditing Standards No. 61 (as may be modified or amended) relating to the conduct of the audit, including any difficulties encountered in the course of the audit work, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management as well as the matters in the written disclosures required by the applicable requirements of the Public Company Accounting Oversight Board regarding the independent accountant's communications with the Audit Committee concerning independence.

9. Review disclosures made to the Audit Committee by the Company's Chief Executive Officer and Chief Financial Officer (or individuals performing similar functions) during their certification process for the Company's Annual Reports on Form 10 -K and Quarterly Reports on Form 10-Q about any significant deficiencies and material weaknesses in the design or operation of

> internal control over financial reporting and any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting.

59. Under the same section, in the subsection "Compliance Oversight Responsibilities," the Audit Committee Charter states that the Audit Committee will:

> 1. Obtain assurance from the independent auditor that Section 10A(b) of the Exchange Act has not been implicated.
>
> 2. Review and approve all related-party transactions.
>
> 3. Inquire and discuss with management the Company's compliance with applicable laws and regulations and with the Company's Code of Ethics in effect at such time, if any, and, where applicable, recommend policies and procedures for future compliance.
>
> 4. Establish procedures (which may be incorporated in the Company's Code of Ethics, in effect a t such time, if any) for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or reports which raise material issues regarding the Company's financial statements or accounting policies.
>
> 5. Discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.
>
> 6. Discuss with the Company's General Counsel legal matters that may have a material impact on the financial statements or the Company's compliance policies.
>
> 7. Review and approve all payments made to the Company's officers and directors or its or their affiliates. Any payments made to members of the Audit Committee will be reviewed and approved by the Board, with the interested director or directors abstaining from such review and approval.

60. Under the heading "Reporting," the Audit Committee Charter states the following:

> The Committee shall report to the Board periodically. The Committee shall

> prepare a statement each year concerning its compliance with this charter for inclusion in the Company's proxy statement. The Committee shall periodically review and assess the adequacy of this charter and recommend any proposed changes to the Board for approval.

61. In violation of the Audit Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

62. Richtech is a robotics and AI-focused Company headquartered in Las Vegas, Nevada. The Company's products generally surround embodied AI systems intended for various uses across U.S. businesses.

63. Embodied AI refers to AI systems which take on a physical form, such as autonomous drones and humanoid robots. As noted above, Richtech's products are designed for numerous industries including, but not limited to, manufacturing, food service, retail, hospitality, automotive, and healthcare.

64. The Company has stated its intention for its AI systems to engage in activities such as scrubbing floors, packaging deliveries, and operating factory production lines. Moreover, the Company has stated its intention to become a "Super-Operator," or a Company operating over one hundred thousand AI-based intelligent

robots.

65. Among the Company's robotic products is ADAM, an AI service robot featuring dual arms. ADAM's intended purpose is to automate the beverage-making process in hospitality and retail settings. ADAM is capable of fulfilling the entirety of the beverage-making process, including mixing, shaking, and even espresso extraction.

66. On December 29, 2025, the Company filed a form NT 10-K: Notification of inability to timely file Form 10-K 405, 10-K, 10-KSB 405, 10-KSB, 10-KT, or 10-KT405 (the "2025 NT 10-K"), regarding its required annual report on Form 10-K for the fiscal year ended September 30, 2025 (the "FY 2025 10-K"). Given the Company's size, it was permitted by the SEC to file its FY 2025 10-K as late as December 29, 2025. Nevertheless, the Company filed the 2025 NT 10-K, allowing the Company to submit the FY 2025 10-K as late as January 13, 2026. Even with this extension, the Company once again failed to timely file the FY 2025 10-K, only filing the report with the SEC on January 20, 2026.

67. On January 27, 2026, the Company initiated the January 2026 Private Placement. As a result of the January 2026 Private Placement, 8,500,000 shares of Company Class B Common Stock were purchased at a purchase price of $4.55 per share, for aggregate gross proceeds of approximately $38.7 million. After factoring in expenses, the January 2026 Private Placement closed on January 29, 2026, for net proceeds of approximately $36.2 million.

**<u>False and Misleading Statements</u>**

***January 27, 2026 Press Release***

68. The Relevant Period began on January 27, 2026, when the Company issued the Collaboration Press Release. The Collaboration Press Release contained the following subheading: "[*j*]***oint engineering effort*** *with Microsoft AI Co-Innovation Labs enhances Richtech's ADAM robot and extends intelligent automaton across physical environments"* (italicization in original).

69. The Collaboration Press Release also stated the following, in relevant part:

> [Richtech] ***today announced a hands-on collaboration with Microsoft through the Microsoft AI Co-Innovation Labs to jointly develop and deploy agentic artificial intelligence capabilities*** in real-world robotic systems.
>
> ***Through close collaboration between Richtech Robotics' engineering team and Microsoft's AI Co-Innovation Labs***, the companies worked together to enhance Richtech Robotics' ADAM robot with adaptive intelligence powered by Azure AI. ***The collaboration focused on applying vision, voice, and autonomous reasoning to physical environments, enabling robots to move beyond task execution and support more contextual, conversational, and operationally aware interactions***.
>
> ***Richtech Robotics and Microsoft*** enhanced ADAM with additional layers of context awareness, allowing the robot to incorporate signals such as time of day, weather, and promotions, respond more naturally to customer preferences, and apply vision-based models to maintain speed and quality during peak demand. These capabilities also support operational awareness, including notifying staff of ingredient or equipment issues before disruptions occur. These capabilities are designed to support smoother workflows and more responsive customer interactions in retail environments.
>
> ***While ADAM serves as a flagship example, the collaboration demonstrates how agentic AI capabilities*** can be applied across a range of physical environments, including logistics, hospitality, manufacturing, and other operational settings where real-time perception, reasoning, and reliability are essential. By combining physical robotics with cloud-based AI models, Richtech Robotics can apply software-driven intelligence across its portfolio to improve operational visibility, service quality, and performance without requiring extensive new hardware investments.
>
> * * *
>
> The collaboration underscores Richtech Robotics' continued investment in data-driven automation and physical AI, leveraging cloud intelligence, perception, and autonomous reasoning to improve performance across commercial and industrial applications.

70. In addition, the Collaboration Press Release quoted Defendant W. Huang as stating that "[o]ur ***collaboration with Microsoft reflects a shared focus*** on applying

advanced AI to practical, real-world use cases[.] ***By working closely with the Microsoft AI Co-Innovation Labs, our teams were able to jointly develop and deploy intelligent capabilities that*** strengthen reliability, enhance customer interactions, and support scalable automation across physical environments."

***January 28, 2026 Private Placement***

71. On January 28, 2026, the Company issued a press release titled "Richtech Robotics Announces $38.7 Million Private Placement Priced At-The-Market Under Nasdaq Rules" (the "Private Placement Press Release"). The Private Placement Press Release reported that the Company had "entered into a definitive agreement with a fundamentally driven institutional investor for the purchase and sale of 8,500,000 shares of the Company's Class B common stock ***in a private placement priced at the market under Nasdaq rules***." The Private Placement Press Release also stated that the "***private placement is expected to close on or about January 29, 2026***, subject to the satisfaction of customary closing conditions."

72. The statements referenced in ¶¶68-71 above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company did not maintain a commercial collaboration with Microsoft; (2) the Company did not engage in a joint engineering effort with Microsoft; (3) the Company utilized the false claim of its collaborative relationship with Microsoft to raise the price of its stock in anticipation of the January 2026 Private Placement; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

**<u>The Truth Emerges</u>**

***January 29, 2026 Hunterbrook Article***

73. The truth emerged on January 29, 2026, at 12:00 PM EST, when the online publication Hunterbrook Media published the Hunterbrook Article. The Hunterbrook

Article revealed that, after "Richtech [. . .] stock added more than $370 million in market cap on the announcement of a 'collaboration' Tuesday, the company announced a dilutive fundraise the next morning. ***Microsoft tells [Hunterbrook] the engagement was a 'standard' customer program*** with '***no commercial element***.'" The Hunterbrook Article further stated that "[t]his comes after Richtech missed its 10-K deadline, hampering its ability to raise money through at-the-market offerings."

74. The Hunterbrook Article added the following details about the Company's supposed "collaboration" with Microsoft, in relevant part:

> Shares Richtech Robotics ($RR) surged more than 40% on Tuesday after the company announced a "collaboration" with Microsoft through the tech giant's AI Co-Innovation Labs. On the back of that pump, the following morning, Richtech announced a $38 million dilutive fundraise.
>
> ***But Microsoft tells Hunterbrook Media that Richtech is just a customer.***

75. The Hunterbrook Article also quoted a Microsoft representative as stating the following with regard to Microsoft's supposed "collaboration" with the Company:

> Richtech participated in an AI Co-Innovation Lab engagement, which is a standard customer engagement focused on exploring and prototyping AI solutions using Microsoft technologies[.] ***There is no commercial element in this lab engagement***.

76. The Hunterbrook Article stated the following regarding the actual program the Company participated in, in relevant part:

> ***Specifically, Richtech appears to have participated in a program Microsoft describes on its website as being available to "any customers/partners looking to implement Microsoft's AI tools***," including "startups." (You can apply right here — and who knows, maybe you, too, can add $370 million in market cap to your name! Expect a response in "3-5 business days.")
>
> * * *
>
> This strikes a very different tone from Richtech's press release, which cited a "close collaboration" between Richtech and Microsoft.

77. Moreover, the Hunterbrook Article continued to explain the true nature of the Collaboration Press Release and the true nature of the Company's relationship with Microsoft, stating:

> ***The market, at least, seemed to think this implied a meaningful relationship between the two companies — the day of the announcement, $RR saw its steepest daily percentage increase in market cap in over a year***. But based on Microsoft's statement to Hunterbrook, ***no material partnership appears to exist***.
>
> ***And to the extent Richtech actually achieved anything with this press release, its signature accomplishment appears to have been convincing the market that an ordinary, complimentary customer training session amounted to some kind of partnership***. (Sherwood News, owned by Robinhood: "Richtech Robotics soars after announcing partnership with Microsoft." Benzinga: "Richtech Robotics Stock Surges On Microsoft AI Partnership." And so on.)
>
> ***In reality, Microsoft's AI Co-Innovation Labs are described on the company's website as offering "one-week long complimentary, personalized development sprints for engineering teams."*** In other words, the "collaboration" Richtech announced appears to ***be participation in a free prototyping program available to Microsoft customers — not a commercial partnership***.

78. The Hunterbrook Article also discussed the Company's failure to timely file SEC documents, stating the following:

> The Microsoft announcement came just one week after Richtech finally filed its delayed 10-K with the SEC on January 20, 2026, even missing its extended deadline.
>
> Richtech's fiscal year ended September 30, 2025. As a smaller reporting company, it had until December 29 to file its annual report. Instead, the company filed an NT 10-K (notification of late filing), claiming "additional time is needed to finalize the financial statements." That extension seemingly granted Richtech until January 13 to file. The deadline came and went with no filing.

> Failing to file timely reports, as required by Nasdaq Listing Rule 5250(c)(1), triggers an automatic deficiency notice. Once Nasdaq's Listings Qualifications Department issues that notice — which may already have happened behind closed doors — Richtech has just four business days to publicly disclose its deficiency notice via an 8-K filing.
>
> A review of Richtech's SEC filings shows no such 8-K was filed between the January 13 deadline and the January 20 10-K filing. ***Did Richtech receive a deficiency notice and fail to disclose it? Richtech did not answer this question in its reply to Hunterbrook's request for comment.***

79. In addition, the Hunterbrook Article stated the following regarding the Company's private placement, notably referencing prior allegations of fraud against the Company and the beneficial timing of the Private Placement at the retail's expense:

> Even without the fraud allegations, Richtech's numbers are bleak. The 10-K filing included Richtech's financial figures, which reveal a cash-burning machine. Fiscal year 2025 revenue totaled $5.045 million, with a net loss of $15.754 million — nearly double the prior year's $8.14 million loss. After the Microsoft announcement, the company now has a market capitalization of more than $1 billion.
>
> Without substantial revenue, to fund its operations, Richtech has repeatedly diluted shareholders by raising money through the issuance of new shares. But missing its 10-K filing deadline limited its options to secure more cash.
>
> To use the Form S-3 process — the streamlined registration that enables fundraising approaches like shelf offerings and ATM programs — companies must have filed all required SEC reports on time for the preceding 12 months. SEC Rule 12b-25 allows a 15-day grace period for late filers, during which the filing is "deemed" timely. Richtech missed that deadline. The 10-K officially became delinquent, and barring some departure from standard policy, the company should have lost S-3 eligibility.
>
> ***That means Richtech cannot tap its shelf registration or ATM program until it has 12 consecutive months of timely filings — so the earliest it could regain eligibility is January 2027. For a company burning over $20 million a year on $5 million in revenue, losing easy access to capital markets may be an existential problem.***
>
> ***So Richtech found another way to raise money.***

> ***On Wednesday morning — one day after the Microsoft announcement sent shares soaring — Richtech announced a $38.7 million private placement, selling millions of shares to an institutional investor "priced at the market under Nasdaq rules."*** Unlike ATM offerings, private placements under Regulation D don't require S-3 eligibility.
>
> ***The timing could be problematic. Under Nasdaq rules, the "Minimum Price" for a private placement is the lower of the closing price or trailing five-day average immediately preceding the signing of the binding agreement***. We don't yet know when the agreement was signed — that will be disclosed in the 8-K filing.
>
> ***If the deal was signed after Monday's 44% surge, part of the pump would be baked into the Minimum Price calculation, allowing the company to raise capital at a higher price than would have been possible days earlier***, while the investor would still be able to buy Richtech stock meaningfully below market price.
>
> ***But if the deal was signed before the Microsoft announcement, it's even more striking: The institutional investor locked in shares at a price based on the pre-pump stock, and then the very next day, a "collaboration" announcement sent the stock soaring — meaning the institution is now sitting on immediate paper gains while retail investors bought in at the top***.
>
> ***The playbook, in other words, seems to be: Miss your 10-K deadline, limiting your ability to fundraise; announce a "close collaboration" that in reality appears to be a one-week program open to just about anybody; watch the stock surge 44%; then disclose a private placement the next morning***, allowing institutional investors to buy shares at a cheaper price than retail.
>
> We may never know what Richtech learned about software engineering at the Microsoft Innovation Lab. But what seems clear is these guys could teach a course of their own on financial engineering.

80. On this news, the price per share of the Company's Class B common stock fell $1.06, or approximately 20.87%, from a price per share of $5.08 at the close of trading on January 28, 2026 to close at $4.02 per share on January 29, 2026. As the market continued to react to the revelations about the Company's relationship with Microsoft, the

Company's Class B common stock fell a further $0.44 per share, or approximately 10.9%, from a price per share of $4.02 per share at the close of trading on January 29, 2026 to close at $3.58 per share on January 30, 2026.

## DAMAGES TO RICHTECH

81. As a direct and proximate result of the Individual Defendants' conduct, Richtech has lost and expended, and will continue to lose and expend, many millions of dollars.

82. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

83. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

84. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

85. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

86. As a direct and proximate result of the Individual Defendants' conduct, Richtech has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, waste of corporate assets, gross mismanagement, abuse

of control, and violations of the Exchange Act.

## DERIVATIVE ALLEGATIONS

87. Plaintiff brings this action derivatively and for the benefit of Richtech to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Richtech, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

88. Richtech is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

89. Plaintiff is, and has been at all relevant times, a shareholder of Richtech. Plaintiff will adequately and fairly represent the interests of Richtech in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

90. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

91. A pre-suit demand on the Board of Richtech is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following five individuals: Defendants W. Huang, M. Huang, Factor, Markscheid, and Shigley (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to three of the five Directors-Defendants who are on the Board at the time this action is commenced.

92. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

93. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Richtech to issue materially false and misleading statements. Specifically, the Director-Defendants caused Richtech to issue false and misleading statements which were intended to make Richtech appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

94. Additional reasons that demand on Defendant W. Huang is futile follow. Defendant W. Huang is the Company's founder and has served as its CEO and as a Company director since its founding in July 2016. As such, the Company provides Defendant W. Huang with his principal occupation for which he receives lucrative compensation. Defendant W. Huang is also a controlling shareholder of the Company. Thus, as the Company admits, he is a non-independent director. As the Company's highest officer, Defendant W. Huang was ultimately responsible for the issuance of all of the false and misleading statements during the Relevant Period. In addition, as the Company's highest officer, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant W. Huang is named as a defendant in the Securities Class Action. Further, Defendant W. Huang is related to Defendant M. Huang, his brother. As such, Defendant W. Huang cannot disinterestedly consider a demand to sue the directors, which include his brother. For these reasons, Defendant W. Huang breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

95. Additional reasons that demand on Defendant M. Huang is futile follow.

Defendant M. Huang is the Company's co-founder and has served as the Company's CFO and as a Company director since its founding in July 2016. He receives handsome compensation for his role at the Company. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant M. Huang is named as a defendant in the Securities Class Action. Further, Defendant M. Huang is related to Defendant W. Huang, his brother. As such, Defendant M. Huang cannot disinterestedly consider a demand to sue the directors, which include his brother. For these reasons, Defendant M. Huang breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

96. Additional reasons that demand on Defendant Factor is futile follow. Defendant Factor has served as a Company director since November 2023. Defendant Factor currently serves as the Chair of the Nominating and Corporate Governance Committee, as a member of the Audit Committee, and as a member of the Compensation Committee. He receives handsome compensation for his role at the Company. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Factor breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

97. Additional reasons that demand on Defendant Markscheid is futile follow. Defendant Markscheid has served as a Company director since November 2023. Defendant Markscheid currently serves as the Chair of the Compensation Committee, as a member of

the Audit Committee, and as a member of the Nominating and Corporate Governance Committee. He receives handsome compensation for his role at the Company. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Markscheid breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

98. Additional reasons that demand on Defendant Shigley is futile follow. Defendant has served as a Company director since November 2023. Defendant Shigley currently serves as the Chair of the Audit Committee. He receives handsome compensation for his role at the Company. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Shigley breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

99. Additional reasons that demand on the Board is futile follow.

100. Defendants Shigley (as Chair), Factor, and Markscheid (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate

the Individual Defendants' violations of law and breaches of fiduciary duty; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

101. In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. In further violation of the Code of Ethics, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

102. The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

103. The acts complained of herein constitute violations of fiduciary duties owed by Richtech's officers and directors, and these acts are incapable of ratification.

104. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Richtech. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Richtech, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

105. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Richtech to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

106. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least three of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

107. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

108. Each Individual Defendant owed to the Company the duty to exercise candor,

good faith, and loyalty in the management and administration of Richtech's business and affairs.

109. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

110. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Richtech.

111. In breach of their fiduciary duties owed to Richtech, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company did not maintain a commercial collaboration with Microsoft; (2) the Company did not engage in a joint engineering effort with Microsoft; (3) the Company utilized the false claim of its collaborative relationship with Microsoft to raise the price of its stock in anticipation of the January 2026 Private Placement; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

112. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

113. Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

114. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or

acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Richtech's securities.

115. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Richtech's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

116. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

117. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Richtech has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

118. Plaintiff, on behalf of Richtech, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Unjust Enrichment

119. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

120. By their wrongful acts, violations of law, and false and misleading statements

and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Richtech.

121. The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from Richtech that was tied to the performance or artificially inflated valuation of Richtech, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

122. Plaintiff, as a shareholder and a representative of Richtech, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

123. Plaintiff, on behalf of Richtech, has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

124. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

125. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

126. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Richtech to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust

the Company and its products.

127. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

128. Plaintiff, on behalf of Richtech, has no adequate remedy at law.

**FOURTH CLAIM**

**Against the Individual Defendants for Gross Mismanagement**

129. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

130. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Richtech in a manner consistent with the operations of a publicly held corporation.

131. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Richtech has sustained and will continue to sustain significant damages.

132. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

133. Plaintiff, on behalf of Richtech, has no adequate remedy at law.

**FIFTH CLAIM**

**Against the Individual Defendants for Abuse of Control**

134. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

135. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Richtech, for which they are legally responsible.

136. As a direct and proximate result of the Individual Defendants' abuse of control, Richtech has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

137. Plaintiff, on behalf of Richtech, has no adequate remedy at law.

**SIXTH CLAIM**

**Against Defendants W. Huang and M. Huang for Contribution Under Sections 10(b) and 21D of the Exchange Act**

138. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

139. Richtech and Defendants W. Huang and M. Huang are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants W. Huang's and M. Huang's willful and/or reckless violations of their obligations as officers and/or directors of Richtech.

140. Defendants W. Huang and M. Huang, because of their positions of control and authority as officers and/or directors of Richtech, were able to and did, directly or indirectly, exercise control over the business and corporate affairs of Richtech, including the wrongful acts complained of herein and in the Securities Class Action.

141. Accordingly, Defendants W. Huang and M. Huang are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

142. As such, Richtech is entitled to receive all appropriate contribution or indemnification from Defendants W. Huang and M. Huang.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Richtech,

and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Richtech;

(c) Determining and awarding to Richtech the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Richtech and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Richtech and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Richtech to nominate at least three candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e) Awarding Richtech restitution from the Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: April 6, 2026

Respectfully submitted,

**MUEHLBAUER LAW OFFICE, LTD.**

*/s/ Andrew R. Muehlbauer*
Andrew R. Muehlbauer, Esq.
Nevada Bar No. 10161
7915 West Sahara Ave., Suite 104
Las Vegas, NV 89117
Telephone: (702) 330-4505
Email: andrew@mlolegal.com

*Attorneys for Plaintiff*

Of Counsel:

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net